**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWIN DAVIS | : | |
| | : | |
| Appellant | : | No. 2194 EDA 2019 |

Appeal from the PCRA Order Entered June 27, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005487-2013

BEFORE:  SHOGAN, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED AUGUST 10, 2020**

Appellant, Edwin Davis, appeals from the June 27, 2019 denial of his first Post Conviction Relief Act ("PCRA") petition, 42 Pa.C.S. §§ 9541–9546. We affirm.

In Appellant's direct appeal,[1] we adopted the trial court's factual summary of the crimes, as follows:

> Between 5:00 and 6:00 p.m. on February 6, 2013, co-defendant Michelle White and her housemate Marlieta Cowan, left their home at 5427 Walker Street and walked two to three blocks to the apartment complex at 5728 Cottage Street, where co-defendant Paul White, Michelle White's father, lived.  From outside the apartment complex, Michelle White and Cowan observed a verbal altercation inside the complex's main hallway between Paul White, Omar Simmons, Tony Crawford, and Richard Boykin about an alleged $20 debt.  The argument quickly turned physical and

---

[1] Appellant, his brother, Evan Davis, and Paul White, the father of Michelle White, were tried together by a jury and the Honorable Barbara A. McDermott.

spilled outside, where Simmons and Paul White exchanged punches.

Cowan and Michelle White separated Simmons and Paul White, breaking up the fight. Michelle White then approached Simmons and shouted, "If you want to fight, I can call my brother and you could fight one of my brothers," referring to her brothers-in-law, [Appellant] and co-defendant Evan Davis.[3] Incensed, Michelle and Paul White argued with Simmons, Crawford, and Boykin, whereupon Michelle White reiterated that she could call her brothers to fight Simmons.

[3] Michelle White is married to [Appellant's] and Evan Davis' older brother, Ernest Davis.

Between 8 p.m. and 9 p.m., Cowan and Michelle White returned to 5427 Walker Street, where Michelle White spoke to Evan Davis on the phone. Although Michelle White was not struck during the altercation with Simmons, Crawford, and Boykin, she told Evan Davis that Simmons punched her. At approximately 9:13 p.m., Evan Davis and his friend "Hasan" arrived at 5427 Walker Street. Evan Davis and Hasan began cleaning two semi-automatic pistols, using rubber gloves and towels supplied by Michelle White. Shortly thereafter, [Appellant] and an unidentified individual arrived at the home and watched Evan Davis and Hasan prepare the weapons.

At approximately 9:50 p.m., [Appellant], armed with a concealed handgun, walked to Paul White's apartment, accompanied by Evan Davis, Michelle White, Hasan, and the unidentified individual. Upon their arrival, Paul White told [Appellant] that Simmons was in the victim's [Khiry Harris's] apartment and directed him to Boyle's[2] apartment. At Boyle's apartment, Paul White asked Boyle to knock on the door of apartment B3. Boyle led the group to apartment B3 and knocked on the door, but received no response.

From outside the apartment door, Boyle heard a television and the sound of voices coming from inside the apartment. After several knocks, [Appellant] and Evan Davis pushed Boyle away

---

[2] Richard Boyle lived in a separate apartment in the same apartment complex as the victim. N.T., 7/1/15, at 7–9.

- 2 -

and began kicking the apartment door. Upon hearing an unidentified sound, [Appellant] and Evan Davis drew their weapons and fired several shots into the apartment door and surrounding wall.

Inside the apartment, Krystal Evans woke to the sound of gunfire and observed Simmons break a window and attempt to escape. Evans quickly discovered [Khiry Harris, ("the victim")] on the floor near the apartment's bathroom, convulsing and struggling to breathe. Evans immediately checked the victim, observed two profusely-bleeding gunshot wounds, and called 911.

At 9:58 p.m., Officers Philip Lanz and Mark Swierczynski received a radio call for a person shot at 5728 Cottage Street. At 10:00 p.m., the officers arrived at the scene, observed four bullet holes in the apartment's entryway door, and discovered the victim inside, lying in a pool of blood. After securing the scene, the officers escorted Simmons and Evans to homicide for questioning.

At 10:10 p.m., medics arrived and pronounced the victim dead at the scene. At trial, Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, testified that the victim suffered from a perforating gunshot wound and a penetrating gunshot wound that entered the victim's central chest and the victim's lower abdomen, respectively. The perforating gunshot wound's projectile travelled through the victim's right lung, heart, and liver, exiting his left back. The penetrating gunshot wound's projectile travelled through the victim's colon and was recovered from the victim's right pelvis. Each gunshot wound was fatal.

Immediately after the shooting, [Appellant], Evan Davis, Michelle White, Hasan, and the unidentified individual returned to 5427 Walker Street. As Michelle White returned, Cowan observed that she "looked like she was a ghost," and otherwise seemed distraught. Michelle White told Cowan that [Appellant] and Evan Davis "lit up the place."

At 11:15 p.m., Officer Robert Flade of the Philadelphia Crime Scene unit arrived at 5728 Cottage Street. In the hallway, Officer Flade discovered three .380 caliber and five []9 mm caliber fired cartridge casings ("FCCs"). Inside the apartment, Officer Flade discovered twelve strike marks, inserted probes to determine the direction of travel, and recovered two projectiles. At trial, Officer Flade testified that the trajectory of the bullets was

consistent with shots fired in the apartment hallway from two different guns located at two different angles respective to the apartment door.

After an investigation, firearms expert Officer Raymond Andruczak determined, to a reasonable degree of scientific certainty, that two of the .380 caliber FCCs and five of the []9 mm caliber FCCs were fired from the same .380 caliber and []9mm caliber semi-automatic pistol, respectively.

On February 7, 2013, in an interview with Detective Gregory Singleton, Michelle White admitted her involvement in the shooting and identified [Appellant] and Evan Davis as the shooters. On that same date, Detectives Griffin and Spotwood interviewed Boyle, who also identified [Appellant] and Evan Davis as the shooters.

On February 8, 2013, Officer Mark Jerden arrested [Appellant] and recovered his black and grey cell phone, numbered (267) 897-7551. Detectives did not retrieve the associated cell phone records.

Officer Daniel Williams arrested Evan Davis on February 8, 2013. After the arrest, Detective Singleton recovered Evan Davis' cell phone and executed a valid search warrant to obtain the phone's records. Special Agent William Shute of the Federal Bureau of Investigation, an expert in historical cell cite analysis, analyzed the phone records and discovered that the phone associated with Evan Davis called the phone associated with [Appellant] three times between 9:05 p.m. and 9:13 p.m. on the night of the murder. By cross-referencing the phone records with historical cell site data, Agent Shute determined that between 9:05 to 9:13 p.m., the phone associated with Evan Davis travelled towards 5427 Walker Street, and that at the time of the murder, the cell phone was in the general vicinity of 5728 Cottage Street.

On December 23, 2013, Michelle White pled guilty to Third-Degree Murder and Conspiracy for the death of Khiry Harris. As part of her plea, Michelle White agreed to testify truthfully against [Appellant] and his co-conspirators in exchange for consideration at sentencing.

On July 2, 2015, in a trial held immediately after the jury had rendered its verdict, [Appellant] stipulated that he had been

previously convicted of two enumerated offenses under 18 Pa.C.S. § 6105.

***Commonwealth v. Davis***, 159 A.3d 576, 3194 EDA 2015 (Pa. Super. filed November 2, 2016) (unpublished memorandum ) (citing Trial Court Opinion in direct appeal, 1/15/16, at 2–6 (footnote and internal citations omitted)).

On July 2, 2015, the jury convicted Appellant of one count each of third-degree murder, conspiracy to commit murder, and firearms not to be carried without a license[3] and acquitted him of carrying a firearm on a public street in Philadelphia. That same day at a bifurcated trial, Appellant waived his right to a jury trial, and the trial court found Appellant guilty of possession of a firearm prohibited.[4] All remaining charges were *nol prossed*.

Sentencing was deferred for the completion of presentence and mental-health reports. On September 18, 2015, the trial court sentenced Appellant to imprisonment for twenty to forty years for third-degree murder, a consecutive term of five to ten years for possession of a firearm prohibited, and concurrent terms of ten to twenty years for conspiracy and three to six years for firearms not to be carried without a license, for an aggregate sentence of twenty-five to fifty years of imprisonment.[5]

---

[3] 18 Pa.C.S. §§ 2502(c), 903(c), and 6106(a)(1), respectively.

[4] 18 Pa.C.S. § 6105(a)(1).

[5] Co-defendant Michelle White pled guilty plea to third-degree murder and conspiracy and was ultimately sentenced to seven to fourteen years of

Appellant filed a post-sentence motion, which the trial court denied on October 13, 2015. Appellant filed a timely notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.[6] This Court affirmed the judgment of sentence, and our Supreme Court denied further review. ***Davis***, 159 A.3d 576, *appeal denied*, 168 A.3d 1278, 514 EAL 2016 (Pa. filed April 25, 2017).

On January 2, 2018, Appellant filed a timely *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended PCRA petition on June 25, 2018, and a supplemental PCRA petition on September 13, 2018. The PCRA court held a bifurcated PCRA evidentiary hearing on April 16, 2019, and April 25, 2019. The PCRA court denied PCRA relief on June 27, 2019. Appellant filed a timely notice of appeal, and the PCRA court complied with Pa.R.A.P. 1925.[7]

---

imprisonment followed by two years of probation. ***See*** CP-51-CR-005484-2013. Co-defendant Evan Davis initially was convicted of third-degree murder and related offenses at the conclusion of the instant trial. On January 4, 2016, the trial court granted Evan Davis a new trial because the Commonwealth failed to timely furnish its DNA evidence and permit him to call a DNA expert witness. Upon retrial by a jury, Evan Davis was convicted of third-degree murder and related offenses. The trial court imposed a total sentence of twenty to forty years of imprisonment. ***See*** CP-51-CR-0005486-2013; PCRA Court Opinion, 6/27/19, at 1 n.1.

[6] Trial counsel withdrew after filing the notice of appeal, and new counsel was appointed as appellate counsel.

[7] The trial court obviously had a Pa.R.A.P. 1925(b) statement before it, but docket entries in the certified record do not indicate Appellant's compliance with the rule.

Appellant raises the following issues on appeal:

I. Did the PCRA Court err when it found that counsel did not violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by failing to request that the [c]ourt have James White brought down to [c]ourt to testify about the letter he received and conversations he had with his mother, Michelle White, and for failing to use that evidence to both exonerate the Appellant and impeach cooperating co-defendant, Michelle White?

II. Did the PCRA Court err when it found that counsel did not violate Appellant's rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1, sec. 9 of the Pennsylvania Constitution by failing to obtain and use critical discovery that would have impeached Commonwealth eyewitness Richard Boyle?

III. Did the PCRA Court err when it found that counsel did not violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution for failing to object to the [c]ourt's incorrect re-statement of what occurred and/or renew the motion *in limine* related to Cowan's testimony at the trial when she had been in the courtroom during a significant portion of Richard Boyle['s] testimony at the Preliminary Hearing?

IV. Did the PCRA Court err when it found that counsel at trial and on direct appeal were not ineffective for failing to object to the admission at trial of uncontested DNA evidence definitively linking Appellant's brother to the murder weapon, violating Appellant's Fifth, Sixth and Fourteenth Amendment rights?

V. Did the PCRA Court err when it found that counsel on direct appeal, James Berardinelli[,] was not ineffective for failing to move to supplement the claims raised and/or remand to include an after discovered claim that the sentence imposed on the Appellant was an abuse of discretion and arbitrary, capricious and excessive in light of the sentence codefendant, Evan Davis received, violating the Appellant[']s Eighth and Fourteenth Amendment rights?

Appellant's Brief at 3–4.

When reviewing the propriety of an order denying PCRA relief, we consider the record in the light most favorable to the prevailing party at the PCRA level. *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015); *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*). This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. *Commonwealth v. Robinson*, 139 A.3d 178, 185 (Pa. 2016). These errors include a constitutional violation or ineffectiveness of counsel, which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Cousar*, 154 A.3d 287, 296 (Pa. 2017); 42 Pa.C.S. § 9543(a)(2). The PCRA court's findings will not be disturbed unless there is no support for them in the certified record. *Commonwealth v. Lippert*, 85 A.3d 1095, 1100 (Pa. Super. 2014).

All of Appellant's issues aver the ineffective assistance of trial counsel, and in two instances, also direct-appeal counsel. To plead and prove ineffective assistance of counsel, a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act. *Commonwealth v. Stewart*, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any one of these prongs. *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). Counsel is presumed to have rendered effective

assistance of counsel. ***Commonwealth v. Montalvo***, 114 A.3d 401, 410 (Pa. 2015). Moreover, we have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. ***Commonwealth v. Loner***, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

Appellant first argues that trial counsel was ineffective for failing to interview Michelle White's son, James White, who was in prison, and call him as a witness to "testify to admissions made by Michelle that exonerated" Appellant. Appellant's Brief at 14; N.T., 6/30/15, at 131. Appellant avers that James White would have described a letter he allegedly received from Michelle, who testified for the Commonwealth, wherein she stated that Appellant "didn't do nothing [sic]." Appellant's Brief at 15. Appellant asserts that James White gave Appellant the letter, and Appellant told his counsel about the letter, who "promised to take and look at [it] when they got inside the courtroom." ***Id.*** at 16.

At the conclusion of Michelle White's testimony, trial counsel asked the trial court not to release Ms. White because "my client just gave me something that might have some kind of bearing." N.T., 6/30/15, at 130. The following exchange ensued:

> [Defense Counsel]: Judge, I ask them to keep [Ms. White] for about an hour, till we come back. . . . [M]y client just gave me something that might have some kind of bearing.
>
> The Court: Well, no, because then we are bringing the jury right back out now. Hold that juror.
>
> [Defense Counsel]: Well, I haven't read it.

- 9 -

[The Commonwealth]:  I haven't read it either.

The Court:  . . . All right.  Read the letter.

* * *

[Defense Counsel]:  **I don' think I'm going to use [it]**.

The Court: For the record, though, since you raised it, what—your client showed you a letter this morning?

[Defense Counsel]:  That's correct, Your Honor.

* * *

The Court: So what was allegedly in the letter, or letters?

[Defense Counsel]:  Something about, to the effect that Ms. White stated that she was the one or someone other than my client was involved in the incident.

The Court:  And is that letter from Miss White?

[Defense Counsel]:  That letter looks like it is from Miss White, **but I don't see it signed by Miss White**.

The Court:  You don't see what?

[Defense Counsel]:  It is signed, I don't see any kind of signature from Miss White on this letter.

The Court:  Did it come from a prison?

[Counsel for Evan Davis]:  It is actually addressed to her son James White, and it is signed "mom."

N.T., 6/30/15, at 129–132 (emphases added).

At the conclusion of the Commonwealth's case-in-chief, the trial court asked defense counsel, "There was some discussion about a James White.  Am I correct?"  N.T., 6/30/15, at 181.  Defense counsel replied affirmatively, and

- 10 -

the trial court addressed Appellant stating, "[T]hat was based upon information of a letter[,] and I actually saw you pass it to your attorney today." *Id.* The trial court asked defense counsel, "[Y]ou're not in a position to decide whether or not you're going to present [him as a witness?]," and defense counsel replied, "That's correct." *Id.* at 182. Ultimately, defense counsel did not present James White as a witness. Appellant argues that the failure to offer James White's testimony constituted ineffective assistance of counsel that prejudiced Appellant. Appellant's Brief at 21–22.

At the PCRA evidentiary hearing,[8] testimony established that the letter given to defense counsel at trial, allegedly from Michelle White to James White, never was found. N.T., 4/16/19, at 8. No letter was offered into evidence at the PCRA hearing. PCRA Court Opinion, 6/27/19, at 7. At the PCRA hearing, James White testified that at the time of trial, he gave a statement to defense counsel's investigator, Mark Shaffer, that he received a letter from his mother that indicated Appellant and Michelle White were walking away from the scene at the time of the murder, and Appellant "at no time fired a gun." N.T. 4/16/19, at 18–22. Mr. Shaffer took a written statement from James White and provided it to defense counsel. Appellant's Exhibit P-1; PCRA Court Opinion, 6/27/19, at 7.

---

[8] The PCRA court noted that "[t]rial counsel passed away prior to the evidentiary hearing dates, and was unavailable to provide any testimony before he expired." PCRA Court Opinion, 6/27/19, at 7.

To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, an appellant must prove: "(1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on [the] appellant's behalf; and (5) the absence of the testimony prejudiced [the] appellant." *Commonwealth v. Chmiel*, 889 A.2d 501, 545-546 (Pa. 2005) (citations omitted). Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness's testimony would have been beneficial or helpful in establishing the asserted defense. *Id*. Appellant must demonstrate how the testimony of the uncalled witness would have been beneficial under the circumstances of the case. *Id*.

We conclude this issue lacks merit. At trial, Appellant agreed that he had spoken to James White and would not be calling him as a witness, as evidenced by the following:

> The Court: Now, I already went over yesterday potential witnesses with you. [Defense counsel] had one potential witness brought down, and he spoke with you, [Appellant]. And what was his name, James White?
>
> [Defense Counsel]: James White.
>
> The Court: And you are not presenting him [as a witness]; is that correct, [Appellant]?
>
> [Appellant]: Correct.

- 12 -

N.T., 7/1/15, at 149–150. Appellant cannot now contradict his sworn statement. *See Commonwealth v. Pander*, 100 A.3d 626, 642 (Pa. Super. 2014) (ineffectiveness claim for failure to call witnesses fails where "the colloquy conclusively establishes that Appellant agreed with trial counsel's decision not to present additional witnesses."). For this reason alone, Appellant's ineffectiveness claim fails—he chose not to call the witness that he now faults defense counsel for not presenting at trial.

Further, we rely upon the trial court's explanation for its rejection of this issue, as follows:

> [Appellant] fails to meet his burden of proof, and this [c]ourt did not find [Appellant's] or James White's testimony to be credible, especially in light of the credible testimony provided by [Mr.] Shaffer and Michelle White. Although [Appellant] claims Michelle White sent her son James White a letter alleging that [Appellant] did not fire a weapon on the night of the murder, [Appellant] does not have a copy of the letter and failed to provide one to this Court. During the evidentiary hearing, James White testified that, before the instant trial, he gave [Appellant] a letter he received from his mother, Michelle White, which indicated that [Appellant] was not involved in the instant shooting. N.T. 4/16/2019 at 17, 22-23. Though [Appellant] claims he possessed this letter for more than a week before trial, he did not furnish trial counsel with this letter until after trial commenced. N.T. 6/30/2015 at 132. After sending his investigator to obtain a statement, trial counsel brought James White to the courtroom as a possible witness, and after a colloquy on July 1, 2015, [Appellant] informed this [c]ourt that he agreed with counsel's decision not to call James White. N.T. 7/1/2015 at 149-150.
>
> Trial counsel is now deceased and could not testify at the evidentiary hearing. But given the averments made during the evidentiary hearing, it is clear that [Appellant] suffered no prejudice, and the contents of the letter, if believed, would not alter the jury's verdict. At the evidentiary hearing, James White testified that the letter indicated that [Appellant] was present at

- 13 -

the scene of the shooting, but did not fire a shot, and instead was walking away from the area with Michelle White. However, the contents of this letter were contradicted by Michelle White's evidentiary hearing testimony, wherein she testified that she never told James White that [Appellant] wasn't involved in the murder. N.T. 4/25/2019 at 15-17. White further testified that she testified consistently with her police statement, implicating [Appellant] as a shooter, not only at [Appellant's] trial, but also at the subsequent trial for co-defendant Evan Davis. *Id*. at 9-10. This [c]ourt found Michelle White's evidentiary hearing testimony consistent to that she provided at multiple trials, and therefore credible. James White's nebulous testimony concerning a letter that has not been proven to have existed is insufficient to overcome this [c]ourt's credibility determination[.]

Even if the contents of the purported letter were to be believed, [Appellant] would still be found guilty of Third-Degree Murder. Michelle White ultimately pled guilty of that offense, and the uncontradicted facts presented at trial demonstrate that she did not possess a firearm and was not a shooter. Moreover, [Appellant] was present inside Michelle White's home when codefendant Evan Davis was preparing his firearm, and he accompanied Evan Davis, Has[]an, and Paul and Michelle White to the decedent's complex with the intent of causing harm. Based on the totality of the evidence, it is clear that [Appellant] actively participated in a Conspiracy with his co-defendants, rendering him liable for Third-Degree Murder.[9]

PCRA Court Opinion, 6/27/19, at 10–12. It is clear that Appellant is unable to

prove prejudice resulting from any absence of testimony by James White at

trial. *Commonwealth v. Sneed*, 45 A.3d 1096 (Pa. 2012) (absence of

_____

[9] "[U]ndisputed participation in [a] conspiracy which result[s] in [the victim's] death supports [a] conviction of third degree murder." *See Commonwealth v. Bigelow*, 611 A.2d 301, 304 (Pa. Super. 1992) (each member of a conspiracy to third-degree murder is also guilty for the acts of his co-conspirators).

testimony of witness must have been so prejudicial as to have denied the appellant of a fair trial). Thus, we reject this claim.

Appellant next contends defense counsel was ineffective for failing to obtain and use "critical discovery" to impeach Commonwealth eyewitness Richard Boyle. Appellant's Brief at 22. We disagree.

Specifically, Appellant avers that defense counsel was ineffective for not obtaining prison telephone records to impeach Richard Boyle, who testified at trial and identified Appellant as a shooter. Appellant's Brief at 35–43; N.T., 7/1/15, at 8. Appellant contends that the telephone records would have proven that Paul White manipulated and intimidated Mr. Boyle to identify Appellant as a shooter. Appellant's Brief at 36–39. In particular, Appellant points to a recorded call on April 3, 2013, *inter alia*, wherein Paul White "proceeded to rehearse . . . testimony with Boyle." *Id.* at 38. He also identifies other prison calls in April of 2013, which occurred before trial but after Mr. Boyle had identified Appellant to police in February 2013, suggesting those calls supported Appellant's claim that Mr. White coached Mr. Boyle to identify Appellant by his tattoos. *Id.* at 37–40.

As pointed out by the Commonwealth, however, Mr. Boyle "had already identified [Appellant] in a photo array after the shooting[] and testified that at that time[,] he had no doubt about his identification[]." Commonwealth's Brief at 17 (citing N.T., 7/1/15, at 16[, 17]).

The trial court addressed this issue as follows:

- 15 -

A witness may be cross examined as to any matter tending to show the interest or bias of the witness. **Commonwealth v. Solano**, 129 A.3d 1156, 1175 (Pa. 2015) (citing **Commonwealth v. Nolen**, 634 A.2d 192, 196 (Pa. 1993)). Trial counsel should not be found ineffective for failing to impeach a witness when the witness is impeached by other means. **Commonwealth v. Reid**, 99 A.3d 427, 444 (Pa. 2014) (citing **Commonwealth v. Dennis**, 715 A.2d 404, 408-409 (Pa.1998)).

Appellant's claim fails because trial counsel effectively impeached Boyle concerning his bias and credibility during cross examination. Trial counsel elicited testimony that Boyle was incapable of identifying in [c]ourt because of his poor eyesight caused by the eye disease keratitis, that he implicated [Appellant] because he wanted to avoid a murder charge of his own, was an extreme alcoholic and was debilitatingly drunk on the night of the murder, and had previously been convicted of *crimen falsi* offenses. N.T. 7/1/2015 at 20-29. That Paul White allegedly instructed Boyle to "stick to his story" is of no consequence to this [c]ourt, as the statement itself is too vague to imply any manipulation of Boyle's testimony. Moreover, even if Paul White did attempt to influence Boyle's testimony, his attempt was unsuccessful, as Boyle implicated both Paul and Michelle White as participants in the murder. *Id.* at 8-11. Accordingly, [Appellant] fails to demonstrate prejudice, and the instant claim fails.

PCRA Court Opinion, 6/27/19, at 12–13.[10]

We rely upon the PCRA court's explanation. The telephone records identified by Appellant would not have proven that Paul White manipulated and intimidated Mr. Boyle to identify Appellant as a shooter, so that Appellant's evidence falls short of establishing arguable merit, **Martin**, 5 A.3d at 183; thus, the issue lacks merit.

_____

[10] Paul White passed away on February 28, 2017, and Richard Boyle also had passed away, so neither man testified at the PCRA evidentiary hearings in April of 2019. N.T., 4/25/19, at 19–20, 46; PCRA Court Opinion, 6/27/19, at 17 n.5.

In his third issue, Appellant asserts defense counsel was ineffective for failing to object to Marlieta Cowan's testimony. Appellant suggests Ms. Cowan violated a sequestration order during the first preliminary hearing on April 24, 2013, observed Mr. Boyle's testimony there, and "molded her subsequent testimony" at the second preliminary hearing on June 10, 2013, "to fit what she heard Boyle testify to at the first preliminary hearing." Appellant's Brief at 44, 46.

The record certified to us on appeal does not contain a transcript from the first preliminary hearing on April 24, 2013. It is well-settled that "this Court may consider only the facts that have been duly certified in the record when deciding an appeal." *Commonwealth v. Kennedy*, 151 A.3d 1117, 1127 (Pa. Super. 2016) (citation omitted). It is Appellant's responsibility to ensure that this Court has the complete record necessary to review his claim. *Id.* (citation omitted). When an appellant fails to provide this Court the necessary items for review, the claim is waived. *Id.* (citation omitted). Appellant's failure to ensure the inclusion of the transcript in the certified record renders it impossible for us to review its contents and determine the validity of Appellant's allegation. Therefore, this omission hampers appellate review, and we deem the issue waived. *Id.*

Nevertheless, if we were to address the issue on the basis of the record before us, we would rely on the PCRA court's explanation as follows:

> This matter had two preliminary hearings, on April 24 and June 10, 2013. During the April 24, 2013, preliminary hearing, Boyle

testified to the effect that he was with codefendant Paul White at the time of the shooting, spoke with [Appellant] and Evan Davis after they entered the apartment, identified the [victim's] apartment to him, and observed them draw pistols and shoot at the apartment door. N.T. 4/24/2013 at 24-36. When asked by the prosecutor whether Cowan was in the room, Boyle indicated that she was. *Id.* at 37. After a brief inquiry, counsel and the [c]ourt determined that Cowan was in fact sequestered during Boyle's testimony, and Boyle clarified that she was previously in the courtroom before he began his testimony. *Id.* at 37-38.

Cowan testified at the June 10, 2013 preliminary hearing before the Honorable Benjamin Lemer. Immediately prior to her taking the stand, counsel for [Appellant] objected to the admission of her testimony on the basis of a possible sequestration violation. N.T. 6/10/2013 at 7-10. After consulting the notes of testimony, Judge Lerner determined that Boyle had misspoke during the April 24, 2013 preliminary hearing, and that **Cowan was not present in the room**. *Id.* at 10.

Based on these circumstances, it is clear that counsel had no basis to challenge the admission of Cowan's testimony at trial. There is no indication on the record that Cowan was in the room during Boyle's testimony, heard any of Boyle's preliminary hearing testimony, or otherwise had her testimony tainted due to the events that transpired at the preliminary hearing. While [Appellant's] counsel did raise an objection to Cowan's testimony at the [June 10, 2013] preliminary hearing, Judge Lerner soundly and properly rejected that challenge. [N.T., 6/10/13, at 7–10]. Since the matter was already settled at a prior listing, any attempt by trial counsel to relitigate the issue at trial would have been fruitless. Accordingly, [Appellant] fails to demonstrate prejudice.

PCRA Court Opinion, 6/27/19, at 13–14 (emphasis added).

"In order to demonstrate a defendant was prejudiced by counsel's deficient performance, the defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" ***Commonwealth v. Burno***, 94 A.3d 956, 976 (Pa. 2014); ***see also Commonwealth v. Blakeney***, 108 A.3d 739,

749 (Pa. 2014) (to establish prejudice, PCRA petitioner must show that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's deficient performance).

Even if Ms. Cowan had been present for a portion of Mr. Boyle's testimony, Appellant has not supported how Mr. Boyle's testimony had any impact on Ms. Cowan's testimony or the outcome of the trial. ***See Commonwealth v. Pursell***, 724 A.2d 293, 310 (Pa. 1999) (failure to show prejudice rendered an ineffectiveness claim against counsel, who failed to object to the presence of a police witness after trial court ordered sequestration, meritless). Thus, Appellant cannot carry his burden of showing prejudice from trial counsel's alleged ineffectiveness. ***See Commonwealth v. Wright***, 961 A.2d 119, 148 (Pa. 2008) ("When it is clear the party asserting an ineffectiveness claim has failed to meet the prejudice prong of the ineffectiveness test, the claim may be dismissed on that basis alone, without a determination of whether the first two prongs have been met."); ***see also Burno***, 94 A.3d at 977 (claim of ineffectiveness failed because petitioner did not meet burden demonstrating prejudice). Thus, even if not waived, we would conclude that Appellant has failed to prove counsel's ineffectiveness.

Next, Appellant contends defense counsel and appellate counsel were ineffective for failing to seek a new trial based on DNA evidence that the Commonwealth used at Appellant's trial linking Appellant's brother, Evan, a

co-defendant, to the murder weapon.   Appellant's Brief at 48.   Appellant

posits:

> On June 18, 2015, eleven days before trial was to begin, the prosecutor learned that police had recovered the latex gloves from Michelle's apartment that were believed to be used by Evan and Stewart to clean the guns and bullets that were used to commit the crime.  The prosecutor averred that he was unaware that the gloves had been recovered as this evidence was not documented in the investigation of the crime scene by the assigned detective. The gloves were recorded by a different officer in a separate crime scene report.

> On June 19, 2015, the prosecutor obtained a court order for a sample of Evan's DNA to determine if the DNA testing of the gloves matched his sample.

> On June 26, 2015, the prosecutor received the laboratory report which revealed that there was substantial likelihood that Evan's DNA was on one set of gloves.  The DNA testing from the other set of gloves excluded Evan Davis but did not identify the contributor(s). (N.T. 6/29/15 pg. 16-17).  There was a stipulation between counsel for Evan and the Commonwealth that the DNA evidence to be presented related to Evan only. (N.T. 6/30/15 pg. 138).

> On June 27, 2015, Evan's counsel filed a motion to exclude the DNA evidence or, in the alternative, to grant a continuance. The trial court denied this motion, finding that the prosecutor had not deliberately withheld the evidence.  The trial court additionally refused to grant the continuance which it argued, would result in a *de facto* severance of Evan's [trial] from his co–defendants.

> While the trial court denied the motion for a continuance/severance, it did provide Evan with funding to obtain his own DNA expert.   The trial court expressly warned the Commonwealth that if Evan were convicted in the joint trial and he subsequently received a contradictory opinion from his DNA expert, he could file a motion for a new trial.  The Commonwealth thus faced the risk of having to retry Evan a second time.  The prosecutor agreed with this remedy, asserting that the expert report he received was "such a conservative estimate that [he]

- 20 -

would be shocked if another DNA lab disagrees." (N.T. 6/29/15, at 14).

Appellant's counsel ineffectively failed to object on the basis that admission of this "uncontested" scientifically reliable evidence would also result in prejudice to the Appellant and not just his brother, Evan Davis.

Appellant's Brief at 48–50 (footnote and internal citation omitted).

The PCRA court stated:

[Appellant's] suggested claim lacks an objectively reasonable basis. The Commonwealth's DNA evidence excluded [Appellant] as an originator of the sample, and the DNA evidence was never used against [Appellant]. Trial counsel seized on this at trial, when he effectively elicited such an admission from the Commonwealth's DNA expert during cross examination, and further reminded the jury of that fact during closing argument. N.T. 6/29/2015 at 185-186; N.T. 7/1/2015 at 191.

Any attempt to argue that the jury conflated DNA evidence implicating co-defendant Evan Davis against [Appellant] would be wholly unwarranted. At the onset of the instant trial, this [c]ourt provided the jury with the following instruction, charging them to consider only the evidence as it pertains to a particular defendant:

Now, when I refer to it as "this case," one of the things I have to tell you, there [are] three individual defendants on trial. What this means is that while I may refer to it as one case, there [are] actually three separate cases that are going on here. And if you are picked to serve on this jury, you have to consider the evidence as [the] Commonwealth presents it as it pertains to each particular defendant.

N.T. 6/25/2015 at 30. Accordingly, the instant claim fails.

PCRA Court Opinion, 6/27/19, at 15.

We agree that the instant claim fails. Appellant avers that it "was not just Evan, . . . who was prejudiced by the admission of that evidence."

Appellant's Brief at 51. However, Appellant wholly fails to identify such prejudice. *Id.* at 51–52. Therefore, we reject this claim of ineffectiveness. *Burno*, 94 A.3d at 977 (claim of ineffectiveness failed because petitioner did not carry burden demonstrating prejudice).

Appellant's final issue avers ineffective assistance of appellate counsel for failing to challenge Appellant's sentence in light of the sentence imposed on Evan Davis, Appellant's co-defendant and brother, upon his retrial. Appellant's Brief at 52.

We observe that Appellant challenged the discretionary aspects of his sentence in a post-sentence motion for reconsideration of sentence, which the trial court denied on October 13, 2015. Appellant raised the issue in his Pa.R.A.P. 1925(b) statement on direct appeal, challenging the sentence as excessive, and the trial court addressed it in its Rule 1925(a) opinion. However, Appellant abandoned the issue in his direct appeal. *Davis*, 159 A.3d 576 (unpublished memorandum at 4 n.3). Appellant could have challenged his sentence in his direct appeal to this Court but did not do so. *Commonwealth v. Lambert*, 797 A.2d 232, 240 (Pa. 2001) (PCRA petitioner's issues that could have been raised on direct appeal but were not, are waived under 42 Pa.C.S. § 9544(b)). Now, in this PCRA appeal, Appellant asserts that appellate counsel was ineffective for failing to challenge Appellant's sentence in light of the aggregate twenty-to-forty-year sentence imposed on his brother, Evan, following Evan's retrial. Appellant's Brief at 53.

"The law is well settled that co-defendants are not required to receive identical sentences." ***Commonwealth v. Mastromarino***, 2 A.3d 581, 589 (Pa. Super. 2010). "This is not to say, however, that the court must specifically refer to the sentence of a co-defendant. Rather, it requires that when there is a disparity between co-defendants' sentences, a sentencing court must give reasons particular to each defendant explaining why they received their individual sentences." ***Id***. In the instant case, the trial court imposed an aggregate twenty-five to fifty year term of imprisonment.

In rejecting this issue, we rely on the explanation offered by the PCRA court, as follows:

> In his final claim, [Appellant] avers that appellate counsel was ineffective for failing to challenge his sentence as arbitrary and capricious, after co-defendant received a lesser sentence following to his subsequent trial[.] When imposing a sentence, a trial court "shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense . . . and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). It is well-settled that sentencing is a matter vested in the sound discretion of the trial court, and will not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa. Super. 2014) (citing *Commonwealth v. Robinson*, 931 A.2d 15, 26 (Pa. Super. 2007)). An abuse of discretion is not merely an error in judgment; a defendant must establish that the sentencing court misapplied the law or exercised its judgment for reasons of partiality, prejudice, bias, or ill-will, or arrived at a manifestly unreasonable decision. *Commonwealth v. Anderson*, 830 A.2d 1013, 1018 (Pa. Super. 2003).
>
> A defendant challenging the discretionary aspects of his sentence must establish, *inter alia*, that there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. *Commonwealth v. Eisenberg*, 98 A.3d 1268 1277 (Pa. 2014); 42 Pa.C.S. § 9781(b). A substantial question

exists when an appellant raises "a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process." *Commonwealth v. Gonzalez*, 109 A.3d 711, 731 (Pa. Super. 2015). An issue concerning the legality of sentence is reviewable and cannot be waived. *Commonwealth v. Olson*, 179 A.3d 1134, 1137 (Pa. Super.2018) (citing *Commonwealth v. Jones*, 932 A.2d 179, 182 (Pa. Super. 2007)).

\* \* \*

While [Appellant] frames this challenge[] as a failure to retroactively impose an identical sentence to the twenty to forty year term of imprisonment ultimately received by co-defendant Evan Davis, the substance of [Appellant's] claim has been previously litigated. *See* 1925(a) Opinion [in the direct appeal]. Now, Appellant is not entitled to relief on this claim because appellate counsel had no reasonable basis to pursue a challenge to the discretionary aspects of [Appellant's] sentence, even in light of co-defendant Evan Davis' subsequent trial. Here, [Appellant] was convicted of Third-Degree Murder, Conspiracy, VUFA 6105, and VUFA 6106,and received a total sentence of 25-50 years of imprisonment. Evan Davis was convicted of Third-Degree Murder, Conspiracy, VUFA 6106 and VUFA 6108, and received a total sentence of 20-40 years of imprisonment.

This [c]ourt considered a multitude of factors in anticipation to [Appellant's] sentencing that differentiate [Appellant] from his co-defendant. Prior to his arrest in this matter, [Appellant] had five convictions—including Possession of an Instrument of Crime, Harassment, and drug charges—four probation violations, and two revocations, for a prior record score of four. N.T. 9/18/2015 at 3-4. This crime violated the terms of [Appellant's] supervision under the Honorable Alfred DiBona and the Honorable Holly Ford. *Id*. at 4. Although [Appellant] earned his high school diploma and was employed at the time of the murder, [Appellant] incurred three disciplinary infractions in prison between the time of his arrest and imposition of sentence, including a fifteen day segregation for controlled substance/alcohol abuse in May 2014 and a seven day cell lockdown in March 2015. *Id.* at 16-21. Comparatively, co-defendant Evan Davis did not have a prior record, was not charged and convicted of VUFA 6105, an additional second-degree felony, and did not have a negative adjustment to prison.

- 24 -

The record and the Superior Court's prior ruling indicate that this court imposed a lawful and justified sentence. This [c]ourt reviewed [Appellant's] pre-sentence and mental health reports prior to sentencing. This [c]ourt further heard testimony from [Appellant's] loved ones, and ultimately balanced these considerations with [Appellant's] prior record and the crime itself. Accordingly, the 25-50 year total sentence was justified. Given [Appellant's] high prior record [score] and negative prison adjustment, as compared to his co-defendant, the difference in sentences is consistent with a logical and predictable administration of justice. Appellate counsel therefore had no reason to challenge this [c]ourt's sentence for a second time, and the instant claim fails.

PCRA Court Opinion, 6/27/19, at 15–18 (footnote omitted).

Therefore, as the PCRA court determined, it is abundantly clear that

Appellant is not entitled to relief. We agree with the sound reasoning of the

PCRA court, which is fully supported by the record.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/20